

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-10-1996

# United States v. MacLeod

Precedential or Non-Precedential:

Docket 94-5561

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"United States v. MacLeod" (1996). *1996 Decisions.* Paper 192.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/192

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

—————————————

NO. 94-5561

—————————————

UNITED STATES OF AMERICA

v.

JOHN MACLEOD

Appellant

—————————————————————

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civ. No. 94-cr-00131-1)

—————————————————————

Argued:  September 21, 1995

Before: BECKER, STAPLETON, Circuit Judges.
and LANCASTER, District Judge.[0]

(Filed April 10, 1996)

JACK J. ZAPPACOSTA, ESQUIRE (ARGUED)
Zarrillo & Zappacosta
1930 Route 70 East
Executive Mews, Suite X-116
Cherry Hill, NJ   08003

Counsel for Appellant

LESLIE F. SCHWARTZ, ESQUIRE (ARGUED)
Faith S. Hochberg, Esquire
Kevin McNulty, Esquire
Office of United States Attorney
970 Broad Street, Room 502
Newark, NJ   07102

Counsel for Appellee

—————————

[0]Honorable Gary L. Lancaster, United States District Judge for the Western District of Pennsylvania, sitting by designation.

OPINION OF THE COURT

BECKER, <u>Circuit Judge</u>

Defendant John MacLeod pled guilty to two crimes: inducing minors to engage in sexual activity for the purpose of producing child pornography, and transporting minors across state lines with the intent to engage in sexual activity. This appeal involves the propriety, under the United States Sentencing Guidelines ("guidelines" or "USSG"), of a district court's upward departure based on the large number of victims harmed by the defendant. Under the applicable guideline, USSG § 3D1.4, MacLeod's presumptive guideline range was 121-151 months. However, this guideline allows only six victims to be taken into account in determining the base offense level while MacLeod's offense involved at least ten minors. To punish MacLeod for these additional victims, the district court departed upward four sentencing levels, making MacLeod's new guidelines range 188 to 235 months. The district court sentenced MacLeod to 235 months, and he now appeals.

In connection with departures, we follow a three step review process. Our review is plenary as to whether departure was permissible; clearly erroneous as to whether the facts support the grounds relied upon for departure; and deferential as to the reasonableness of the departure. <u>See</u> <u>United States v. Kikumura</u>, 918 F.2d 1084, 1098 (3d Cir. 1990). Applying this standard, we conclude that the presence of additional, uncounted

3

victims is an appropriate basis for upward departure and that the facts of record support the district court's decision to depart. In evaluating the reasonableness of the departure, we seek guidance from the structure of the guidelines themselves. We find it in the commentary to Chapter 3, Part D and in analogy to other guidelines sections (as well as case law from other circuits). Because the district court's departure violated the principle of "declining marginal punishment" as enunciated in the commentary to Chapter 3, Part D, see USSG Ch.3, Pt.D, intro. comment., and exceeded the pattern for upward adjustments in both the theft and fraud sections of the guidelines, see USSG §§2B1.1, 2F1.1, we conclude that the extent of the district court's departure was unreasonable. We therefore vacate the judgment and remand for resentencing.

I.      **Facts and Procedural History**

       A.  The Offense

       MacLeod, a resident of Silver Spring, Maryland, participated with his co-defendant, Eric Nastelin, in a child pornography ring from December 1991 to August 1993. The relevant facts are summarized as follows.

       On August 6, 1993, the mother of a fourteen year old boy, V-1, advised the Montgomery County, Maryland Police Department that MacLeod had befriended her son and two other fourteen year olds, V-2 and V-3. The mother reported that her son would return home from outings with MacLeod with forty to fifty dollars in unexplained cash. She also related that V-1 and another boy had confided to her friend, Donald Shipley, that

4

MacLeod had taken "home videos" of them at the Red Roof Inn near the BWI Airport and at MacLeod's apartment in Silver Spring, Maryland.

Based upon this information, Detective John Lyon interviewed Shipley. Shipley explained that over the past several months he had driven V-1 and V-2 to a roller rink to meet MacLeod. Both V-1 and V-3 had informed Shipley that MacLeod and another male had filmed them having sex. Maryland law enforcement set up surveillance of MacLeod and observed him traveling between Silver Spring and the Dundalk area of Baltimore several times. Each time, MacLeod would meet with different boys, approximately thirteen to fifteen years old, and drive them to various locations including, on one occasion, a Baltimore motel.

Lyon also interviewed V-1. V-1 attested to MacLeod's involvement with child pornography. V-1's first sexual encounter with MacLeod occurred in December 1992 at the Red Roof Inn where MacLeod performed oral sex on V-1. V-1 was paid forty dollars for his participation. V-3 and V-4 (the brother of V-1, age thirteen) were also present. They were filmed having sex with each other by Nastelin. V-4 was paid $ 250.

In January 1992, V-1 made his first sex film for MacLeod and Nastelin. In it, he performed sex acts with V-3. Over the next seven months, V-1 made approximately eleven more films. The movies involved him having sex with V-2, V-3, and, on one occasion, with his brother, V-4. The boys were compensated for their participation.

5

On August 21, 1993, MacLeod and Nastelin were arrested by agents of the FBI. Nastelin immediately cooperated by providing detailed statements. He explained that in 1991 he began traveling from New Jersey to Baltimore to meet MacLeod at various hotels to have sex with boys. In December 1991, Nastelin conceived the idea of filming boys having sex with each other, and purchased a video camera for this purpose. MacLeod approved the plan and made the necessary arrangements for boys and for hotel rooms. Approximately twenty films were made in Baltimore. After the completion of each film, Nastelin would make copies and MacLeod would travel to New Jersey to retrieve one or more of them. Nastelin also stated that, upon MacLeod's suggestion, the men stored their large collection of child pornography in a storage facility in Lindenwold, New Jersey.[0]

Following MacLeod's arrest, Lyon interviewed V-3. He too confirmed MacLeod's participation in child pornography. During 1992 and 1993 MacLeod had sex with V-3 approximately fifty times. V-3 also participated in sex movies filmed at MacLeod's Silver Spring apartment and various hotels in the Baltimore area. Additionally, the FBI interviewed V-5 and V-6, who at the time of their sexual relations with MacLeod, were age twelve or thirteen, and age fourteen, respectively. V-5 was featured in an early Baltimore film. On one occasion, MacLeod picked up V-5 and V-6

---

[0] The facility contained the following items of child pornography: (a) approximately 347 video tapes; (b) approximately 113 eight millimeter and Super 8 films; (c) approximately 324 magazines; (d) approximately 954 black and white photographs; (e) approximately 232 slides; and (f) books containing visual depictions of children engaged in sexually explicit conduct.

6

in Baltimore and brought them to a friend's residence in Lindenwold. On that trip, MacLeod performed oral sex on V-6 and his friend performed oral sex on V-5. Both boys were paid.

A total of ten boys were ultimately identified as participants in the Baltimore tapes. In addition to V-1 through V-6, V-7 and V-8 (both under age sixteen), V-9 (age sixteen), and V-10 (age seventeen) were identified. However, several boys depicted in the Baltimore tapes and numerous children depicted in the Lindenwold storage locker collection remain unidentified.

B. The Indictment and Plea Agreement

On March 23, 1994, a federal grand jury returned a seven-count indictment against MacLeod. On June 17, 1994, he entered a guilty plea to counts two and seven. Count two charged that from at least as early as December 1991 to on or about August 21, 1993, MacLeod "did knowingly and willfully employ, use, persuade, induce, entice, and coerce individuals under the age of 18 years to engage in sexually explicit conduct for the purpose of producing child pornography, including videotapes, such child pornography having been thereafter transported in interstate commerce. In violation of Title 18, United States Code, Sections 2251(a) and 2." Count seven charged that on or about April or May of 1992, MacLeod "did knowingly and willfully transport an individual under the age of 18 years, between the States of Maryland and New Jersey, with intent to engage in sexual activities with the minor which constitutes a criminal offense, as set forth in [New Jersey Law]. In violation of Title 18, United States Code, Sections 2423 and 2."

7

C.  Sentencing

The district court adopted the sentencing recommendations of MacLeod's probation officer, and thus we focus on the probation officer's report.  Applying the 1993 edition of the guidelines, the probation officer concluded that the applicable guideline for the pornography production count, 18 U.S.C. § 2251(a), is USSG § 2G2.1.  That guideline calls for a base offense level of 25.  Because the offense involved a minor under sixteen years of age, the officer added two levels, see USSG § 2G2.1(b)(1), raising MacLeod's offense level to 27.

Applying the 1993 edition of the guidelines to the transportation of a minor count, 18 U.S.C. § 2423, the probation officer concluded that the applicable guideline is USSG § 2G1.2.  That section specifies a base offense level of 16.  Because the offense involved a minor between the ages of twelve and sixteen, the probation officer added two levels, see USSG § 2G1.2(b)(3), raising the offense level to 18.

In order to arrive at a combined offense level for the two counts, the probation officer applied the grouping rules of Chapter Three, Part D.  Because MacLeod's offenses involved the exploitation of more than one minor, the exploitation of each minor was treated as if it were a separate count of conviction.[0]

---

[0] USSG § 2G2.1, the guideline applicable to the pornography production count, provides that "If the offense involved the exploitation of more than one minor, Chapter Three, Part D (Multiple Counts) shall be applied as if the exploitation of each minor had been contained in a separate count of conviction."  USSG § 2G2.1(c).  Likewise, USSG § 2G1.2, the guideline applicable to the transportation of a minor count, states that "If the offense involved the transportation of more

These "counts" were not grouped.  See USSG § 3D1.2(d) (stating that offenses covered by USSG §§ 2G2.1, 2G1.2 should not be grouped).

The probation officer then calculated the combined offense level for these non-grouped counts.  Under USSG § 3D1.4,[0] the combined offense level is determined by taking the count with the highest offense level -- here, one of the pornography production counts (for which the offense level is 27) -- and adding one offense level for each equally serious (or from one to four levels less serious) count.  Thus, MacLeod's offense level is 27 plus one level for each of the other pornography counts. The transportation of a minor counts are irrelevant because, at an offense level of 18, they are nine levels less serious than the count with the highest offense level.  See USSG § 3D1.4(c) (disregarding any count that is nine levels less serious than the count with the highest offense level).  Although there were at least ten victims of MacLeod's pornography production offense (or rather ten pornography production "counts"), § 3D1.4 only allows six victims to be taken into account (for an increase of five levels).  The probation officer

---

than one person, Chapter Three, Part D (Multiple Counts) shall be applied as if the transportation of each person had been contained in a separate count of conviction."  USSG § 2G1.2(d).

[0]        While this section speaks of calculating the combined offense level for several groups, it also furnishes the methodology for calculating the combined offense level of several non-grouped counts.  The commentary at the end of Chapter 3, Part D offers illustrations.  Example number one applies USSG § 3D1.4 to determine the combined offense level for four counts not grouped under USSG § 3D1.2.  See USSG Ch.3, Pt.D, comment. (n.1).

thus added five levels to MacLeod's offense level of 27, resulting in an offense level of 32.[0]

Pursuant to USSG §§ 3E1.1(a) and (b), the probation officer then lowered MacLeod's offense level by three levels (to 29) for acceptance of responsibility.  Based on a total offense level of 29 and MacLeod's criminal history category of IV, the probation officer concluded that the guideline range for imprisonment was 121 to 151 months.  See USSG Ch.5, Pt.A.  Under USSG § 5K2.0, the sentencing court may depart from this range if it finds that "'there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the

---

[0]   The probation officer's calculations appeared as follows in the presentence report:

Count Two--Use of Minor for Producing Child Pornography

**Adjusted Offense Level (Subtotal):**          27

Count Seven--Transportation of a Minor for
Purpose of Prohibited Sexual Contact

**Adjusted Offense Level (Subtotal):**          18

Multiple Count Adjustment (See Section 3D1.4)

|  |  | Units |
|---|---|---|
| Adjusted Offense Level-Ct. Two-Victim 1 | 27 | 1 |
| Adjusted Offense Level-Ct. Two-Victim 2 | 27 | 1 |
| Adjusted Offense Level-Ct. Two-Victim 3 | 27 | 1 |
| Adjusted Offense Level-Ct. Two-Victim 4 | 27 | 1 |
| Adjusted Offense Level-Ct. Two-Victim 5 | 27 | 1 |
| Adjusted Offense Level-Ct. Two-Victim 6 | 27 | 1 |
| Adjusted Offense Level-Ct. Seven-Victim 1 | 18 | 0 |
| Adjusted Offense Level-Ct. Seven-Victim 2 | 18 | 0 |
| Total Number of Units |  | 6 |
| Greater Adjusted Offense Level | 27 |  |
| Increase in Offense Level | 5 |  |
| **Combined Adjusted Offense Level** |  | 32 |

guidelines that should result in a sentence different from that described.'" While the probation officer's report did not counsel for or against departure, it did suggest that departure might be warranted because hundreds of boys were represented in MacLeod's collection while he was held accountable for only six victims.

At the sentencing hearing, the government asked for the 151 month maximum sentence but took no position on whether an upward departure was appropriate. The district court agreed with the sentencing calculations of the probation officer concluding that MacLeod's guideline range was 121 to 151 months. The district court further determined that an upward departure was appropriate. The commentary to USSG § 3D1.4 counsels departure if after application of the section, the adjustments made are inadequate. USSG § 3D1.4, comment. (backg'd). According to the court, the adjustments were inadequate because they allowed only six children to be taken into account while the offense involved four additional identified children and many other unidentified victims.[0] In calculating the appropriate extent of the departure, the court made clear that it would count only the four identified victims. United States v. MacLeod, No. 94-131, slip

---

[0] When the district court spoke of the minors involved in the offense, it was referring only to the minors involved in the production of the Baltimore tapes. See United States v. MacLeod, 94-131, slip op. 38, 40 (D.N.J. August 26, 1994) ("In fact-- however, [in] those specific tapes, they have identified ten, not six victims, and there are unidentified other victims. Again, we're talking about just those so-called -- they refer to [them] here as the 'Baltimore tapes.' [We're] not talking about the full mass [of materials stored in the Lindenwold locker].").

11

op. 38, 41 (D.N.J. August 26, 1994) ("I'm not going to count the unknown victims, but since we have four known other victims, I'm going to add a level for each one, and I'm going to upward adjust."). The court departed upward four levels--one for each identified victim--raising MacLeod's offense level to 33.

With his category IV criminal history, MacLeod's new sentencing range was 188 to 235 months. The court imposed the maximum 235 month sentence because it believed MacLeod had dedicated his entire adult life to child pornography. The presentence report stated that MacLeod had abused his own children. The court could see no hope for redemption and thus sentenced MacLeod to 120 months imprisonment on count two and 115 months on count seven, the sentences to be served consecutively (for a total of 235 months). The court also imposed concurrent terms of three years supervised release on each count of conviction, and directed that MacLeod pay a special assessment of $ 100.

In this appeal, MacLeod contends that the district court's decision to depart was improper, and alternatively, assuming that departure was appropriate, that the extent of departure was unreasonable.

## II. Analysis

In reviewing departures, we follow a three-step process. Our review is plenary as to whether a departure was permissible; clearly erroneous as to whether the facts support the grounds relied upon for departure; and deferential as to the

12

reasonableness of the departure.  See United States v. Kikumura,
918 F.2d 1084, 1098 (3d Cir. 1990).

A.   Step One--Was Departure Permissible?

A district court may depart from the applicable
guideline range only if it "finds that there exists an
aggravating or mitigating circumstance of a kind, or to a degree,
not adequately taken into consideration by the Sentencing
Commission in formulating the guidelines that should result in a
sentence different from that described."  18 U.S.C. § 3553(b).
Here, the commentary to USSG § 3D1.4 specifically instructs that
"Inasmuch as the maximum increase provided in the guideline is 5
levels, departure would be warranted in the unusual case where
the additional offenses resulted in a total of significantly more
than 5 units."  USSG § 3D1.4, comment. (backg'd).[0]  Following
this commentary, the district court based its decision to depart
on the existence of additional victims[0] not taken into account by
the five level increase.[0]  Under step one of our review process,
we review its decision de novo. See Kikumura, 918 F.2d at 1098.

---

[0]      Under 3D1.2 each offense that is equally serious or
from one to four levels less serious than the offense with the
highest level is counted as one "unit."  One level is added for
each unit.
[0]      Hereinafter, we will use the phrase "additional
offenses" and "additional victims" interchangeably.
[0]   It is true, as MacLeod argues, that the district court, at
one point, ambiguously mentioned the "intensity" of the
defendant's involvement as a reason for departure.  However, when
such remark is viewed in context, it is clear that the district
court used the number of victims as the basis for departure.
United States v. MacLeod, 94-131, slip op. 38, 40-42 (D.N.J.
August 26, 1994).

13

We must first determine upon how many additional offenses the district court based its decision to depart. It is clear that the district court calculated the _extent_ of its (four level) departure using _only_ the four identified, but uncounted, children in the Baltimore tapes. See discussion _supra_ page 11. However, the district court's threshold decision to depart was based on the identified as well as unidentified children in the Baltimore tapes. We do not know the exact number of unidentified children as the presentence report simply states that, "There were _several_ other boys in [the Baltimore tapes] that were unable to be identified." (emphasis added). Giving "several" its ordinary meaning would suggest that there were, perhaps, three unidentified boys. This would bring the total of uncounted children in the Baltimore tapes (and the number of additional offenses upon which the district court relied) to seven (four identified boys plus three unidentified children).

We need not be concerned, however, about our inability to determine the exact number of additional offenses upon which the district court relied. The district court relied on _at least_ four additional offenses, and four uncounted victims makes this

---

Id. at 41 ("I find that an adjustment of five based on six victims, where there are four known, ten victims, and a larger number of unknown victims, the unknown only because they can't be identified, that a further upward adjustment is required.").

Indeed, without explanation, the government asserts, in its brief, that there were seven or eight uncounted boys in the Baltimore tapes. Appellee's Brief at 14-15.

14

an "unusual case" resulting in a total of "significantly more than five units."[0]  We reach this conclusion for several reasons.

First, assuming that the district court based its decision to depart on only four additional victims, this means that nearly half of MacLeod's ten victims were not considered. When close to half of a defendant's crimes may go unpunished, we consider this significant and worthy of departure.

Furthermore, in determining whether, under § 3D1.4, a case is an "unusual case" where the "additional offenses resulted in significantly more than five units," one may consider not only the numerical difference between the six victims considered and the actual number of victims involved, but also the nature of the additional criminal conduct.  See United States v. Pearson, 911 F.2d 186, 189 (9th Cir. 1990) (indicating that it is permissible to take into account nature as well as number of additional offenses in deciding whether to depart in accordance with commentary to USSG § 3D1.4).  In the present case, MacLeod's four additional offenses involved the sexual exploitation of young children.  Two of the victims (V-7 and V-8) were under the age of sixteen.  A third and fourth victim (V-9 and V-10) were only sixteen and seventeen respectively.  Given the potential psychological harm to the young victims of this type of offense, we believe that the addition of (at a minimum) four victims

---

[0]     Obviously, if four additional offenses are significant, five, six, or seven additional offenses would be significant as well.

15

should be considered significant, and hence that upward departure was permissible.

Other courts that have addressed the issue also support this conclusion. Only three published opinions (involving three different United States Courts of Appeals), deal with USSG §3D1.4 departures for numerous offenses. See United States v. Okane, 52 F.3d 828 (10th Cir. 1995); United States v. Pearson, 911 F.2d 186 (9th Cir. 1990); United States v. Chase, 894 F.2d 488 (1st Cir. 1990). Under plenary review (and with little comment), the Chase court found 9 uncounted robberies significant[0] while the Okane court found five uncounted robberies significant.[0] Under abuse

---

[0] United States v. Chase, 894 F.2d 488, 491 (1st Cir. 1990) ("We find the instant case to be one in which the additional offenses (numbering nine) resulted in a total of significantly more than five units. Without question, the circumstance relied upon by the district court to justify departure from the Guidelines -- the large additional number of bank robberies committed by the defendant -- is sufficiently 'unusual' to justify departure.").

[0] United States v. Okane, 52 F.3d 828, 832-33 (10th Cir. 1995) ("We have no trouble concluding Mr. Okane's pleas of guilty to five additional bank robbery charges, which did not amount to additional units under § 3D1.4, nonetheless constitute sufficiently unusual circumstances to support an upward departure under step one. Under similar circumstances involving a defendant who pled guilty to fifteen counts of robbery, only five of which were expressly counted as units under § 3D1.4, the First Circuit [in Chase] stated '[w]ithout question, the circumstance relied on by the district court [i.e., the remaining ten robbery convictions] to justify departure from the Guidelines -- the large additional number of bank robberies committed by the defendant -- is sufficiently "unusual" to justify a departure.'") (citation omitted).

It is worth noting that we believe that the Okane court, in some respects, misapplied § 3D1.4. While that section allows for only a five level increase in offense level, it actually takes into account six victims. Thus, the Chase court used nine (not ten) uncounted robberies as the basis for its departure. Likewise, as the defendant in Okane pled guilty to ten bank robberies, the five level increase in § 3D1.4 accounted for

16

of discretion review, the Pearson court considered two uncounted robberies significant. 911 F.2d at 189-90.[0]

B.    Step Two--Do the Facts Support the Grounds Relied Upon for Departure?

The district court based its decision to depart on the uncounted minors depicted in the Baltimore tapes.  Under step two, we review for clear error whether the record contains a sufficient factual basis to support departure.  See Kikumura, 918 F.2d 1098.  Pursuant to § 3D1.4, only six of MacLeod's victims were used to calculate his presumptive sentence.  The presentence report makes clear that the Baltimore tapes involved the exploitation of at least ten identified victims as well as several unidentified victims.  MacLeod plead guilty to the production of the Baltimore tapes.  Thus, there is no question that his offense involved a significant number of additional uncounted minors.  Accordingly, the district court's determination that the facts on record supported its ground for departure was not clearly erroneous.

C.    Step 3--Was the Extent of Departure Reasonable?

Finally, we must determine whether the extent of the district court's departure -- four levels for four additional

---

six of them.  Hence, there should have been four (not five) uncounted robberies upon which the Okane court could base its departure.

[0]    Unlike this Court, The Ninth Circuit follows a five step review process for departures.  Under this five step process, an assessment of the significance of the additional offenses falls under abuse of discretion review.  United States v. Pearson, 911 F.2d 186, 188-89 (9th Cir 1990).

17

offenses -- was reasonable.[0]  We review the court's determination for abuse of discretion.  See Kikumura, 918 F.2d 1098.  We find it useful to begin our discussion with a simple mathematical analysis.  Had the district court considered only one victim, MacLeod's total offense level would have been 24 and his guideline range would have been seventy-seven to ninety-six months rather than 121 to 151 months (the range applicable after the five level increase of § 3D1.4).  Thus, the first five additional victims raised MacLeod's term of imprisonment by fifty-five months (151 minus ninety-six).  The average increment per additional offense was eleven months (fifty-five divided by five).  When the district court departed an additional four levels for the four uncounted victims, MacLeod's guideline range became 188 to 235 months.  Thus, these four victims raised MacLeod's sentence eighty-four months (235 minus 151) or twenty-one months per victim (eighty-four divided by four).

        In evaluating the reasonableness of the district court's departure, we seek guidance from the guidelines themselves.  See Kikumura, 918 F.2d at 1111 ("Recognizing the need for additional standards, the courts of appeals have recently begun to look to the guidelines themselves for guidance in determining the reasonableness of a departure.  Today we endorse that general approach.") (citations omitted).  When departing from a sentencing range, courts should remain faithful

_____

[0]        The district court was clear that the extent of its departure was based only on the four identified victims.  See discussion supra p. 11.

18

to structured guideline principles and attempt, where possible, to create sentences analogous to those explicitly specified by the guidelines for similar offenses. We note that at higher sentencing ranges, where MacLeod's sentence falls, an increase of one level generally makes a quite large and continually increasing amount of jail time. Thus, we must consider with extreme care the district court's decision to depart four levels.

MacLeod's offense involved Chapter 3, Part D of the sentencing guidelines. The introductory commentary to that part indicates that its aim is "provide incremental punishment for significant additional criminal conduct." USSG Ch.3, Pt.D, intro. comment. However, "the amount of additional punishment [is to] decline[ ] as the number of offenses increase." Id. (emphasis added). The district court's departure is at odds with this principle of declining marginal punishment. MacLeod's first five additional offenses carried an average of eleven additional months imprisonment. Given the district court's departure, MacLeod's final four offenses carried an average of twenty-one additional months imprisonment. Thus, contrary to the commentary to Section 3, Part D, as the number of MacLeod's offenses increased, so did his additional punishment.

An examination of the guideline sections pertaining to both theft and fraud also suggest that the extent of the district court's departure was problematic. These sections are a good source of comparison because they permit, without departure, an offense to be increased beyond five levels (the limit imposed for grouping increments in § 3D1.4). Especially as one gets beyond

19

an increase of five offense levels, each one level increase requires a growing amount of harm. For instance under USSG §2B1.1, the guideline involving theft, embezzlement and receipt of stolen property, raising a five level increase to a six level increase requires $10,000 more loss. Raising a six level increase to a seven level increase requires $20,000 more loss. Raising a nine level increase to a ten level increase requires $80,000 more loss. At the extreme, raising a nineteen level increase to a twenty level increase requires $40,000,000 more loss. USSG § 2F1.1, the guideline for fraud and deceit, forgery, and counterfeiting, follow a similar pattern. Yet, in the instant case, each level of the district court's four level departure was based on the same amount of harm--the exploitation of one child. Analogy to USSG §§ 2B1.1, 2F1.1 suggests that this is unreasonable.

The three court of appeals cases in this area support our decision. In the two cases that found a departure unreasonable, the departure was significantly lower than it is here. In United States v. Okane, 52 F.3d 828 (10th Cir. 1995), the court upheld a departure of one level for five additional bank robberies. The court wrote:

> We find the district court's proffered reason for departing, which was Mr. Okane's additional pleas of guilty to five other robbery charges, is legally sufficient to warrant a one level upward departure. . . .
> While the Guidelines' overarching purpose of achieving uniformity and proportionality in sentencing is a countervailing concern in this calculus, the Guidelines do contemplate some sentencing disparities in cases where the circumstances

20

> justify it.  The Guidelines do not prohibit
> any sentencing disparity; they prohibit
> unwarranted sentencing disparities.  In this
> case, the offenses in question are
> undoubtedly serious and we find they warrant
> a one-level departure.

Id. at 833 (citations omitted).  Thus, in Okane, the court found reasonable a much smaller departure than the one here at issue.

In United States v. Chase, 894 F.2d 490, 491-92 (1st Cir. 1990), the First Circuit affirmed a departure of approximately fifty months for nine additional bank robberies. Dividing fifty months by nine robberies indicates that the average additional imprisonment time for each robbery was approximately five and one-half months.  As this was roughly equivalent to the additional punishment, under the guidelines, for each of the first five additional offenses, the court upheld the departure.  Id.  In the case at bar, the district court departed eighty-four months for four additional offenses.  This resulted in an average of twenty-one additional months imprisonment per offense.  In contrast to the departure found reasonable by the Chase court, this is approximately double the average punishment for the first five additional victims (eleven months).

In the one case that found the district court's departure unreasonable -- United States v. Pearson, 911 F.2d 186, 190 (9th Cir. 1990) -- the district court's departure, approximately fifty-seven months for two offenses (or twenty-eight and one-half months per offense), id. at 187, closely approximates the district court's departure here.  The Ninth

21

Circuit had little difficulty in concluding that the district court's six level departure was unreasonable and that a one level departure would be appropriate instead. Id. at 190-91.

We appreciate the district court's dilemma here. With no previous guidance from this Court, it was obliged to sentence truly repugnant criminal behavior. Its decision to depart was certainly appropriate. However, for the reasons set forth above, the extent of its departure is inconsistent with the exercise of sound discretion.

The commentary to Chapter 3, Part D indicates that the amount of additional punishment should decline as the number of offenses increase. See USSG Ch.3, Pt.D, intro. comment. Thus, the average punishment for the four additional offenses should be somewhat less than eleven months (the average punishment for the first five additional offenses). An appropriate departure, therefore, should be no more than two levels. Under such a departure, MacLeod's new sentencing range would be 151-188 months. A sentence at the upper-end of that range would be a thirty-seven month increase from the original 121 to 151 month guideline (188 minus 151). Dividing thirty-seven by four indicates an addition of approximately nine months imprisonment per offense. A departure of greater magnitude is unreasonable.[0]

---

[0] While we will not impose an explicit upward limit on the district court's ability to depart, should it decide on remand to take into account more than the four identified victims, we do note that the court should remain faithful to the general principles enunciated in this opinion.

The judgment of the district court will therefore be vacated and the case remanded for resentencing consistent with this opinion.